[No. C. D. 2968. *En Banc.* September 17, 1953.]

*In the Matter of Disciplinary Proceedings Against* JAMES P. HEALY, *an Attorney at Law.*[1]

*A. Vernon Stoneman,* for board of governors.

*Rummens, Griffin & Short,* for respondent.

SCHWELLENBACH, J.—The Washington state bar association charged James P. Healy with violation of his oath and duties as an attorney at law, and of the ethics of the profession. A hearing was had in Tacoma, before the trial committee composed of Wallace Mount, John D. Cochran,

[1]Reported in 261 P. (2d) 89.

and Harold Lant, the latter being a member of the board of governors and acting as chairman. Witnesses were sworn and testified, and various exhibits were offered and admitted. The trial committee concluded that the respondent had violated his oath and duty as an attorney and had committed a breach of the Canons of Professional Ethics. The committee recommended that he be suspended from the practice of the law for a period of ninety days. The board of governors reviewed the proceedings had before the trial committee and recommended to this court that the findings of the trial committee warranted a suspension of six months.

The evidence, findings, and recommendations were filed with the clerk of this court, for our consideration, and a hearing was had at which both the board of governors and the respondent were represented by counsel.

James P. Healy was admitted and licensed to practice law in the courts of the state of Washington in July, 1946, and has at all times since practiced law in Tacoma.

Shortly prior to March 23, 1951, William Pinger agreed to sell four lots in Tacoma to Foster A. Feutz, for $20,000, and Feutz paid Pinger $500 down on the transaction. A few days later, the two men went to Healy's office, and he drew up an earnest-money receipt, which they both signed. The receipt contained the following:

"This agreement to be null and void unless the property extends 104 feet along South Washington Street in a North and South direction."

Healy testified in court that Pinger had told him to order the title insurance and that he would pay for it. This was denied by Pinger. The court believed Healy, and so do we.

In due time, a title report was sent to Healy by the Commonwealth Title Company. The title report did not indicate a frontage of 104 feet, and it was determined that a quiet title action would be necessary. Neither of the parties wanted to go to that expense, and the deal was apparently off.

In the meantime, the title company continued to bill Healy for $120, the cost of the title insurance policy. Healy

contacted Pinger and his attorney, Steve O'Brien. Pinger denied ordering the policy and told Healy to see O'Brien. Letters and repeated telephone calls to O'Brien were unavailing. His office always said that he was out.

Finally, on December 4, 1951, Healy commenced an action in superior court against Pinger for $120. The matter came on for trial before Honorable Bartlett Rummel, one of the superior court judges for Pierce county.

However, on the way to the courthouse on the day of trial, Healy stopped at the office of the Commonweath Title Company and contacted its vice-president, Franklin Fogg. He told Mr. Fogg that he had a case pending in court that morning involving an insurance matter between Pinger and Feutz; that possibly the transaction would not go through and that he would want to pay a cancellation fee; that, however, he wished to pay the full premium at that time, and he asked if they would hold his check until that afternoon; that the matter would be resolved in court that morning.

Healy issued a check to the title company in the amount of $120. Fogg took him back to Shirley Varek, the cashier, and asked her to give Healy a receipt and to hold the check, which she did. When Miss Varek was checking her book, she informed Healy that the policy had been canceled, and he replied that it had not been done by him. Prior to that time, a cancellation notice had been sent to Healy's office, but he testified that he knew nothing of it.

At any rate, Healy then went directly to court and testified that Pinger had told him to order the title insurance and that he, Pinger, would pay the bill; that Healy had been billed constantly since the 19th day of April, 1951, and that he had finally gone and paid the title company in order to preserve his own credit with it. He did not advise the court concerning his transaction with the title company that morning, or that his check was to be held by the company. He did not offer in evidence the receipt which he had that day received. Pinger testified, denying that he had ever authorized Healy to order the title policy. At the

close of the case, the court stated that it would give judgment to Healy in the amount prayed for.

Mr. Fogg testified before the trial committee that respondent did not call that afternoon; that, a few days later, he was advised by Healy's office that the order for the policy was to be canceled and to bill Healy for the cancellation fee. Fogg instructed his cashier to return Healy's check and to bill him for the $15 cancellation fee, which was done.

Following that, rumors reached Judge Rummel as to what had transpired, and he made an investigation of the matter, as did Steve O'Brien. When the proposed findings, conclusions, and judgment were before the court, it refused to sign them and dismissed the action.

Mr. Healy testified before the trial committee that he asked Pinger at least twice a week to pay the $120, and that Pinger refused; that he then asked Pinger to sign an affidavit to the effect that the deal was not going through, so the order could be canceled; that Pinger refused to do this; that he was afraid that he might be sued for damages by Pinger unless the latter would call the deal off; that he expected Pinger, after realizing that a judgment of $120 was obtained against him, rather than pay the amount, would say, "Okeh, I'll cancel the policy out now"; that, the afternoon after the trial in the courthouse, he met Paul J. Nolan, an associate of Steve O'Brien, and told him that the matter could be settled for $15 or $20 if Nolan would agree to get his man to cancel the policy, and that Nolan told him that he, Nolan, would have to see Steve O'Brien; that they kept putting him off; and that he finally prepared the findings, conclusions and judgment, still thinking that he was going to force them to come in and say that they would cancel the policy.

We are satisfied that Mr. Healy never at any time had any intention of collecting more than $15 from Pinger on his judgment. Apparently, he had tried for months to settle with Pinger and Steve O'Brien, was honestly afraid that Pinger might bring suit and gouge him out of a considerable

sum of money, and wanted to use this judgment as a pre-ventive club.

Be that as it may, respondent was an attorney at law, and, as such, an officer of the court in which he testified when he obtained his judgment. When respondent was admitted to practice before the courts of this state, he subscribed to an oath which included the following:

"I will . . . never seek to mislead the judge or jury by any artifice or false statement of fact or law, . . . ."

Canon No. 22 of the Canons of Professional Ethics provides:

"The conduct of the lawyer before the court and with other lawyers should be characterized by candor and fairness. . . .

"These and all kindred practices are unprofessional and unworthy of an officer of the law charged, as is the lawyer, with the duty of aiding in the administration of justice."

■■. Respondent did not testify falsely before the court, but in his testimony he failed to exercise the candor which was required of him. It was his duty, as an officer of the court, to fully divulge what had transpired that morning at the office of the title company, in order that the judge might have all of the facts before him.

We are satisfied that respondent's lack of candor warranted the punishment recommended by the board of governors. However, the members of the trial committee, who knew him personally, and who were cognizant of his reputation as an attorney in the community where he practiced, recommended a lighter term of suspension. We feel that the punishment recommended by the trial committee is sufficient, and that he will never again violate his oath as an attorney, or the Canons of Professional Ethics.

It is the order of this court that respondent be suspended from the practice of law for ninety days on the date this decision becomes final.

GRADY, C. J., MALLERY, HILL, HAMLEY, DONWORTH, WEAVER, and OLSON, JJ., concur.

FINLEY, J. (dissenting)—The majority opinion states:

"We are satisfied that Mr. Healy never at any time had any intention of collecting more than $15 from Pinger on his judgment. Apparently, he had tried for months to settle with Pinger and Steve O'Brien, was honestly afraid that Pinger might bring suit and gouge him out of a considerable sum of money, and wanted to use this judgment as a preventive club."

This statement certainly negatives any thought that Mr. Healy intended to enrich himself unjustly at the expense of Mr. Pinger. It highlights the fact, as does the evidence in the record, that Mr. Healy's attempts to negotiate a settlement with Pinger's counsel, Mr. O'Brien, had met with rebuffs for a period of months, and that the matter had become charged with personal animosity which influenced the actions of the attorneys handling this litigation before the trial court. Such situations are not entirely novel and unknown to active practitioners engaged in the rough and tumble which quite often characterizes the *general practice* of law. It is fortunate for the public, the bar, and the bench that such situations are not the *norm* and that, at most, they occur somewhat rarely, when practitioners' usually sound, trustworthy, and laudable perceptive qualities are temporarily thrown out of balance by emotional involvements.

While this can explain, at least to some extent, Mr. Healy's motivation, nevertheless, at best, it is a dubious alibi or an unacceptable rationalization for his conduct. It does not justify or condone his neglecting to observe more scrupulously those acceptable and ethical standards of conduct applicable in the practice of law.

In essence, Mr. Healy's actions, allegedly, were intended to secure for him an advantageous bargaining position in order to compel Pinger or the latter's attorney, Mr. O'Brien, to agree to cancellation of a title insurance policy. After nearly a year of attempted negotiation, the matter apparently had become a *causi belli* between the two attorneys and perhaps between their clients. At any rate, it seems clear from the record that the ill feeling was bilateral. Mr. Healy testified that, in the afternoon after the trial before Judge Rummel, he indicated to Mr. Paul Nolan, an associate

of Mr. O'Brien, that the matter could be settled, that Mr. Pinger would not be required to pay more than fifteen or twenty dollars (cost of title insurance report) on the judgment which Mr. Healy had tentatively secured. Apparently, Mr. O'Brien was not willing to wind up the affair on such a basis. In any event, an affidavit was prepared setting out the facts of Mr. Healy's misconduct and was presented to the grievance committee of the local bar association.

It should be noted, of course, that Mr. O'Brien's conduct was not the subject of any disciplinary proceedings by the bar association. But it appears to me that his actions were not altogether objective or motivated solely by idealism. However that may be, Mr. Healy got caught in the bight of the line where, allegedly, he hoped Mr. O'Brien would be, as a result of the judgment against Mr. Pinger; and Mr. O'Brien (perhaps with or without the luck of the Irish) has come away much the better in the feud with Mr. Healy.

There can be no doubt that Mr. Healy showed bad judgment in not being completely frank and candid with the court. He certainly withheld very pertinent factual information from the court. For this he deserves, in my opinion, a severe admonition. But I cannot agree with the majority opinion herein or with the trial committee that his conduct requires a suspension of *three* months from the practice of law. At the very most, I could possibly agree only to a suspension of *one* month.

---

October 30, 1953. Petition for rehearing denied.